at all, oral argument not to exceed 15 minutes per side. Mr. Simon for the Plaintiff Appellant. You may proceed. Good morning. May it please the Court, Steve Simon for Mr. Aday. We have reserved three minutes of rebuttal time. This is an age discrimination case that was erroneously dismissed on summary judgment. That's the first issue. I'd like to start with the second issue and just touch on it briefly. The District Court also erroneously granted summary judgment on the retaliation claim. That arose from meritless counterclaims that Westfield Insurance brought against Mr. Aday and I'd like to just talk about those briefly. These counterclaims arose from emails that Mr. Aday had filed at Westfield simply sent to himself. He sent the emails from his work email address to his home email address and they claimed in federal court that was misappropriation under the Trade Secrets Act. He sent them to some kind of staff member too, did he not? He sent it to an address that was I think bluespiderfish at gmail.com and that was his wife. That's the only other person he sent them to and the representative of the company at his deposition acknowledged during the investigation they were pretty sure that was his wife. At the deposition they confirmed that. Well the District Court also found that that was not done, that the claims were not filed in bad faith. So is there something in the record that tells us what was actually in these emails? It's correct the District Court found that it was not in bad faith and that's what we're challenging. The District Court spent a lot of time analyzing what was in the emails and attached documents and concluded they were trade secrets. And for purposes of this appeal we're not challenging that. But the fact is that they filed a counterclaim in federal court alleging it was misappropriation. Misappropriation usually entails using or disclosing trade secrets, using them or disclosing to others. They had no evidence of that and the District Court acknowledged that. Instead they had another theory that he had acquired them by improper means. These were documents that he used in the course of work and they said he acquired them by improper means by emailing them to himself. And their theory was that he had done so because he violated numerous established policies of Westfield. This was their allegation in federal court. It was a novel theory that had no case law to support it. There's been none in the briefing with this court. But we still don't know who the other party was. What did you say the address was? No, we do know, Your Honor. It was Blue Spider Fish at Gmail. It was his wife, his domestic partner. That is undisputed. That's in the record. And the email that he sent to his wife while the case was pending in District Court, the defendant filed that of public record, not under seal. And it's actually been of public record for the last two years. So there's no trade secrets in that because they filed it in public record. But the fact is they sent it to his wife. They've acknowledged that's not using or disclosing trade secrets. It's solely based on this idea that he violated numerous established Westfield policies when in fact there was none. And the District Court acknowledged that there was not, not in the employee handbook, there was not a single document they could point to said that it violated Westfield policy to send a work-related email to your home email address. There was none, yet they still alleged it. In fact, they also sued him for sending an email from his work email to his personal email address to his work email address. And so that was a violation of the Trade Secrets Act. Even though their company representative acknowledged lots of other employees had done that, there was no discipline, no termination, none of them were sued in federal court. And the last thing I want to just stress, your honors, the only other time they had sued a former employee or any employee for violation of their emails was an employee who already had sued them or had filed a claim for age discrimination. The only time they've sued anybody for violation of this email policy in court are people who brought age discrimination claims. That was enough for the retaliation claim to go forward and the Trade Secrets Act specifically calls for attorney fees when a claim is made in bad faith. I'm not alleging, by the way, anything sinister against opposing counsel, we have a collegial relationship, that this company, Westfield Insurance, was looking to strike back at this plaintiff who filed an age discrimination claim and they did so with bad faith counterclaims. Turning to, and that decision by the judge should be reversed, turning to the age discrimination claim, we have an employer, Mr. Agay, who is 63 years old, had been with the company 12 years and he applied for a casualty unit leadership position and he was a perfect match for this position. It required leadership experience, which he had. He had been a unit leader in a different division just years earlier. He also had the technical experience that was required for this casualty unit leader position because it was a general liability position that involved lots of different claims, construction defect, premises liability. He was literally a litigation claim specialist at the time and it's acknowledged he had lots of experience handling these different kinds of claims. So leadership experience, technical experience, on top of which the job posting, there were two positions, one of the two jobs said it would be in the western states, that's where the position would be. He was moving to Seattle, Washington. Perfect job. After the interview, he's told by the hiring manager and another manager who participated that he had hit the interview out of the park and that he was the candidate to beat. Yet the 63 year old man does not get the job. He loses out to two substantially younger employees, one of which has only two years with the company, limited experience, and does not live in a western state. He lives in Toledo. We in Ohio are not in a western state. There was sufficient evidence of pretext to warrant a summary judgment and the district court went awry by granting summary judgment. We do, whether we look at a general pretext analysis, your honors, or whether we look at the relative qualifications test that starts in Bender v. Hecht department stores and is articulated in Bartlett v. Gates. That's a decision that two members of this panel were on, a Sixth Circuit case in 2010. Like Bartlett, this court should reverse under the relative qualifications test. Mr. Simon, let me ask you this though. You've kind of done this whole thing in reverse order. Starting with the retaliation claim and then finally moving into the age discrimination case. You get to age discrimination and want to tell us about pretext, but there's got to be discrimination there. What you've got on the record are two pretty isolated, pretty ambiguous comments that are not made by people who were directly involved in the decision not hiring in that position. To my way of thinking, that's where your real problem is in this case. All right. Well, I didn't mean to jump ahead, but it is true. It's acknowledged that Mr. Aday met the prima facie case. He established that there's no dispute. Then we move into pretext. Of course, we're looking at can a reasonable finder of fact find that the stated reason for the decision is suspicious? And it is suspicious because they hired somebody who had just been with the company two years, lives in Toledo, and they're looking for somebody in the western states, and Mr. Aday is moving to Seattle. So right there, we have strong pretext. In the Bartlett case, it says, well, unless you can prove that you're a plainly superior candidate, which I think this is a close case for, it's a high standard, but once you've shown that you have at least the same qualifications, Your Honor, then is there additional probative evidence? Well, we have an individual who says, after the decision is made, Mr. Aday is going to retire and leave because his position is not available. He says, look, this is Mr. Neumeier. I talked to the other managers. I know why you didn't get the job. Everybody thinks that you should put up your piggies and relax and let your wife be the breadwinner. Now, this court has said that a non-decision maker can opine about the bias of the decision makers, and that is probative evidence. And that's what we have. We have a non-decision maker saying, I've talked to the managers and I know why you didn't get the job. We also have the second level manager, Mr. Bowers. Well, at some point in there, he had actually filed for retirement. He filed for retirement, Your Honor, because he told him, my wife's going to Seattle. I want to stay with the company. Can I stay in my job and do it remotely? They say, no. They say, well, maybe a job will come down the pike and you can apply. So he applies. And as I've said, it seems like the perfect job for a number of reasons. And then he doesn't get it. At some point, he has to go to Seattle and join his wife. And that's when he puts in for retirement. But this is a failure to hire case, and they chose two substantially younger employees who are less qualified than him to choose the decision. Now, they've also, what they've really leaned on hard, Your Honor, is that, well, actually the fact that he was in Seattle, that was a bad thing. That was a bad reason. That was a strike against him. And again, you have, after he's interviewed, they know he's going to Seattle, he explains how he's going to do the job out of Seattle, and they tell him, you hit it out of the park, you're the one to beat. Well, that doesn't sound like the decision-maker was thinking that Seattle was a bad thing. That's number one. Number two, the decision-maker, who they say was the sole decision-maker, we believe Mr. Bowers, who had made the comment about year next for retirement, the second level manager, did have input. But she, at her depositions, asked, why did you choose Mr. Zito over Mr. Adair? And she doesn't say anything about Seattle. Eventually, in the deposition, she mentions Seattle. But in their brief, they say that it is a key fact that when he moved to Seattle, they didn't have an office in Washington. And that's a key fact. And in their brief, they cite to an affidavit by a different manager, Betsy Jones, who says that, yeah, we don't have an office in the state of Washington. There is no sworn testimony by the decision-maker, Ms. Lilly, who says that the fact that he was in Seattle and there wasn't an office there and he'd be working remotely, that's why we didn't give him the job. In fact, they offer other evidence that is pretextual. They say he lacked passion, Your Honors. They had, in their interview criteria, motivational fit, which they agreed was the same thing as passion. He scored highest of all the candidates. They say that, well, he stepped down from a leadership role and became a litigation claims specialist. So that was bad. But then another manager admitted that happens all the time at a company. And no one considers that a step down. So Judge Stotts reads a typical discrimination case that I rebuild circumstantially, where there is just loads of pretext. On top of which, you have a non-decision-maker saying, I talked to the managers and here's why you didn't get the job. They thought you should retire. And, Judge, it's one thing to voluntarily retire. It's another that somebody else decides for you. There's one other thing that I want to point out that may not have been clear in the record. This job posting, again, this is document 41-7 in the record, said that we're looking for somebody in the western states. And then it goes on to say that here's what's going to determine if you get the job. Your location, experience, licensing, and passion. Well, he had the best in location. He was going to be in the western states, not the gentleman in Toledo. He had the best experience in, licensing everybody had, and passion. Well, he scored the highest according to their own criteria. So their decisions don't make sense, Your Honor. They have to answer to that. And on retiration, I apologize. I did it in reverse order. But I just think that this claim, I'll just finish with that, that somebody who sends emails to themselves is misappropriation. This doesn't make sense on its face. And when their theory is based on, well, we've got these policies that say you can't do it, and then they don't even have any policies. It's unusual to have to award attorney fees, we understand. But when the party making the claim has their own facts in their possession, they know they don't back up the claims. To me, that's where the attorney fees should have been awarded and the retaliation claim should have been. I just have one very quick question. Is there anything in the record that shows what the company meant by the western states? My recollection is saying that maybe when they said western states, they meant sort of Minnesota and maybe as far west as Arizona, southwest, but I didn't see any indication they meant California, Washington, Oregon, Utah. I mean, I don't know if it makes any difference, but it may be that Toledo is not that far from the western states that they had in mind as opposed to far west coast. Just a quick answer. It's not saying the job posting what they meant by western states, that's number one. It's true that the person who was stepping down and while there was a roll open, she was in Minneapolis. It's true that the direct reports were as far away as Denver and Phoenix, and they were hoping to grow the business out there. That's what's in the record. Alright, thank you sir. We'll hear from Ms. Supinger. Am I pronouncing that right? Supinger, yes your honor. May it please the court. My name is Emily Supinger. I represent Westfield Insurance Company and Ohio Farmers Insurance Company, who was Mr. Aday's employer. I want to address a couple of questions that were asked first before I dive into this. The first question was, what did they mean by, from Judge Cole, what was meant by the western states? Well there actually is evidence in the record from Sheila Lilley, the hiring manager, when she was preparing, she had personal notes when she was preparing the job posting, sorry, I'll do this, you might be able to hear me better. When she was preparing the job posting, which indicated that she was focused on the four offices, the four locations where Westfield had offices, which were in Colorado, which were in Arizona, Minnesota, and Illinois. And Judge Cole is correct that Toledo is geographically closer to three of those four locations than Seattle is. It's also important to note that Westfield does not have any offices whatsoever in northwest United States. None in Washington and none in the surrounding states. The other key factor regarding location is that there are no home offices for which Mr. Aday could work out of, whereas the other four locations had home offices. Before Mr. Aday even applied for this job, he reached out to Ms. Lilley, the hiring manager, and said, do you think this would work with my relocation to Seattle? And Ms. Lilley responded, I think you should sell us on how you can make this work. I'm willing to be creative and think outside the box, but leadership wants to have our leaders in the office more often. That's exactly what she wrote to Mr. Aday. And Mr. Aday came into that interview, as she describes, loaded for bear, to describe how he was going to manage his reports from Seattle. He came in, he had the cost of flights to visit his reports, he had a calendar showing a schedule of how he would visit his reports three times a month. Can I ask something by way of clarification? Was that information in relation to his application for the new position, or was that prior to his seeking the new position when he was simply asking to work remotely? I do understand the difference. This happened when his email to Ms. Lilley indicated that he wanted to apply for this particular job. So he was referring to the unit leader position that Ms. Lilley was hiring for. And the information about the flights and the calendar, he brought those to his interview for that specific position. He never presented that information with regard to trying to maintain the position he was currently in, which was regionally based in Cincinnati, and which his boss, Betsy Jones, and her bosses indicated was not a job that could be done remotely from Seattle. And I think it is important for us all to remember that this was all back before we all learned how to work more efficiently remotely. This is at a time when the office presence was preferred within the organization. It was pre-Zoom. It was pre-Zoom for sure. Another follow-up question. You indicated the manager had in mind a definition of what working in western states would amount to. I'm just wondering if that definition of what constituted the western states, so to speak, was that ever communicated to the applicants for the position, or was that just something the manager had in mind but did not actually communicate that to the applicants? There's nothing in the record to say that that was indicated to the applicants, but the locations of the offices that Westfield has should have been known to the applicants where the reports would be located. Based on what? Why do you say that? Because those are the only four western locations that Westfield has in the organization. If you're applying for a job that's dealing with reports in the western states, Mr. O'Day certainly knew where they were located. When he went into his interview, he had the airline flights to those specific locations, so he certainly understood where the people he was responsible for supervising would be located. Well, it was said that the company wanted to grow the business in the west, so it might not have been all that clear where the person would have to... You're right, it may not have been that clear, but as I indicated, Mr. O'Day certainly knew the places where he was expected to travel to because he came in with those airline flights and calendar schedule of where he intended, how he intended to see his direct reports. And was there an indication in the record that either or both of the other two candidates would be willing to be in one of those four offices if given the job? No, but both of the applicants did end up working in locations where Westfield had a physical office. And what about this idea that the company was attempting to expand further into the... There really isn't anything... Farther west, I guess. There really isn't anything in the record regarding expansion plans. Ms. Lilly does say in passing that there was hope that they would expand business out west. I think she also indicated it really didn't come to fruition, so I can't really speak to whether or not... The record doesn't contain any specific plans about growing the business. And the record doesn't show whether that sort of hope or possible plan was communicated to applicants. It doesn't and it also doesn't indicate that that hope was a determining factor in the hiring process. Thank you. Sure. There's also... Mr. Simon indicated that there is no sworn testimony in the record whatsoever that Mr. Day's location in Seattle was a concern or part of Ms. Lilly's decision making process. And I think that's fundamentally false from looking at her testimony in her deposition. She was very concerned about Mr. Day being located in Seattle. She says specifically, how am I going to know if he's struggling with my complicated claims if he's all the way in Seattle? Lilly had worked in the same office as Mr. Day for many, many years. She had seen and witnessed him in a previous leadership position. And she observed that he seemed to be struggling under his caseload, seemed visibly stressed at times. And she was concerned about the fact that he would be somewhat isolated, not being in an office, not having support around him. And that she would need to pick up and travel to Seattle, where there is no home office again, to assist him or understand what he's going through. She was very concerned about the distance as to where he was going and the fact that he would be working from home in that capacity. She was also very concerned about the cost involved. That any time that she needed to interact with him in person, it would involve a flight, it would involve a cost. So I want to back up a little bit. I want to talk a little bit about the evidence of discrimination that's been brought forth to establish this case. There were, as Judge Daughtery mentioned, only two incidents that the plaintiff refers to. The first is a comment that took place in the lunchroom where Mr. O'Dea alleges that Robert Bowers, who was two levels above the hiring manager in this case, made an off comment during a conversation amongst colleagues as to who might be retiring next. And he said words to the effect of, this one is up, and pointed to Mr. O'Dea. Well, I think there's some serious issues with this being evidence of discrimination. The first being that Mr. Bowers was not the hiring manager for this position. Mr. Bowers was two levels above the hiring manager for this position. Mr. O'Dea... I hate to interrupt you, but who actually made the hiring decision? Ms. Lilly was the sole responsible person for making the hiring decision. Her boss was Jody Hopkins, and Jody Hopkins' boss was Robert Bowers. And the other thing that makes this comment, this stray comment, lack credibility, is that the unrefuted evidence in the record is that Mr. Bowers made efforts to assist Mr. O'Dea in his job search. That Mr. Bowers indicated to Ms. Hopkins, Ms. Lilly's boss, that he was hopeful that O'Dea would be able to find a new position in the company where he could continue to work for the company and do it from his new home in Seattle. That was confirmed by Ms. Hopkins, and it was confirmed by Ms. Lilly. And Ms. Lilly indicated that she felt kind of a little bit of undue pressure because of that comment to hire Mr. O'Dea. But ultimately, and Mr. Bowers testified, that the hiring decisions are left to the hiring managers, and he doesn't interfere with those decisions. Although he would, maybe from time to time, make a suggestion or offer some sort of advice if asked. Finally, before we get to the retaliation, because I am running short on time, I do want to cover one thing about this case that I think makes it extraordinarily unique. And that is that there were 14 applicants for this job. Ten were internal candidates, and they came down with a list of the top five. And this was all done in the context of a draft room that had eight different hiring managers within the company participating in it. And why this is unique is because we actually have documentation that shows a window into the decision making process. And we can see from that process that the top five candidates were all very well qualified. The top four candidates all had decades of experience in the insurance industry. The candidate who was considered the top candidate had been an executive level within the organization. The second candidate, Mr. Zito, had, again, decades of insurance industry. And while only two of those years were with Westfield, it's important to note that Ms. Lilly had been the person who hired him to Westfield in the first place. She had worked closely with him while he was at Westfield, and he was already in a leadership position. Something that Mr. O'Day was not in a leadership position at that time. He also came to the interview prepared to talk about how he was going to use technology to communicate with his reports. And she thought he was very forward thinking in this respect. Now, Mr. O'Day says, well, that's not creative, that's not original, everyone knows you can do that. But that's not what Mr. O'Day did during his interview. He did not stress the importance of using technology. He stressed the importance of going and visiting in person. And maybe a different hiring manager would have thought that's a better approach. But Ms. Lilly did not. Ms. Lilly was impressed with Mr. Zito's presentation, and he was certainly as qualified, if not more qualified, than Mr. O'Day. I do want to hit on the retaliation claim just briefly in my last minute here. Mr. O'Day initially filed a lawsuit against Westfield in February of 2018. That was filed in state court. Westfield filed an answer. Westfield didn't bring counterclaims against Mr. O'Day at that time. Mr. O'Day then filed the lawsuit in federal court, dismissed that lawsuit, and brought the case here. Westfield filed an answer, did not bring counterclaims at that time. The key thing that triggered the counterclaims was when the plaintiff provided his initial disclosures, which revealed that he had engaged in a pattern of emailing information from his work email to his personal email. This required Westfield to conduct a full audit of his email account, because it does violate Westfield policy. Mr. O'Day admitted he had had training on the fact that he is not supposed to send work emails to his personal email account. That is because Westfield deals with highly confidential information on a regular basis. This was their only opportunity. They either had to bring the counterclaim when they brought it, or they had to waive it. That was the decision that was made. It had nothing to do with the fact that Mr. O'Day had filed this claim against him. It had everything to do with the fact that Westfield needed to protect its confidential and proprietary information. If there aren't any questions. Well, just one thing. The information that was emailed by Mr. O'Day, there's a difference between work information and trade secrets. Was it determined before bringing the counterclaim that these were actually trade secrets that he was transferring to his personal email? Yes, your honor. Several of the documents contained confidential proprietary information, including lists of customers and vendors, information revealing how claims had been resolved, those types of items. The trial court did find that those were trade secrets under Ohio law. All right, thank you. Mr. Simon has two minutes for rebuttal. Your honor, they say it's all trade secrets, and they literally filed one of the documents of record, not under seal. It's been on the docket for two years, and they haven't taken it down. The claims were filed in bad faith. Mr. O'Day never admitted that he was trained, that there was a policy. He wasn't supposed to do that. This is a case where the court will need to dig into the record. It was a wonderful argument by Ms. Supinger. It's more fitting for closing argument in front of a jury. There was disputes of fact in this case. Picking up on a question that Judge Cole asked, had there been any actual explication of what in western states meant, I realize that there is a deposition exhibit of Ms. Lilly's deposition. I don't remember if it's exhibit C or D. Couldn't find it in the brief, where she said western states, and she meant at least as west as central time zone. That's how she saw western states. The person who had been in the position was in Minneapolis. Which is a central time zone. Which is central, correct. So you could say, okay, she was thinking western state meant it could be central. They picked somebody from Toledo. And they had somebody who was going to be in Seattle, in the west, who was by far more experienced. This rationale that Ms. Lilly was worried she couldn't see Mr. Adair, would have to go fly to see him. The person who had just held the job was in Minneapolis. She would have had to drive to see that person. These are pretextual reasons upon pretextual reasons that the employer is coming up with to justify. Of course, your client has the disadvantage that he had an absolute requirement that he be in Seattle. If they had said, okay, you've got the job, but to take the job, you've got to move to Phoenix, your client wouldn't have liked that very much, would he? That's true. There was no, they didn't ask him that, of course. And they haven't asked the gentleman from Toledo to move either. One final thing, if I may, I see I'm out of time. It's a very important point. It was asked by Judge Clay, was it ever communicated to the applicants that the job would be in the western states? It is in the job posting. The job posting that alerted the applicants to the job document in 41-7. This was communicated to the applicants it would be in the western states. And instead they picked somebody who had only been with the company two years in Toledo instead of the 63-year-old that was the most experienced. There's disputes of fact, Your Honor, that should be tried. We ask that you reverse the summary judgment of retaliation and discrimination. All right. Thank you. Thanks to both counsel for arguments here today. The case will be submitted. I believe that's the last.